UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X

GARY LIVINGSTON, Individually and
on Behalf of All Others Similarly        **MEMORANDUM AND ORDER**
Situated,

        Plaintiffs,              12-CV-377(KAM)(SMG)

   -against-

CABLEVISION SYSTEMS CORPORATION,
et al.,

        Defendants.

-------------------------------------X

**MATSUMOTO, United States District Judge:**

      Defendants Cablevision Systems Corporation
("Cablevision" or "the company"), James L. Dolan ("Dolan"),
Gregg G. Seibert ("Seibert"), Michael Huseby ("Huseby"), and
Thomas M. Rutledge ("Rutledge"), (the "Individual Defendants,"
and, collectively with Cablevision, "Defendants"), move to
dismiss the Amended Complaint of lead plaintiffs Iron Workers
Local No. 25 Pension Fund and Alaska Electrical Pension Fund
(collectively, "Plaintiffs").  (*See* ECF No. 29, Mot. to
Dismiss.)  Plaintiffs' Amended Complaint seeks remedies from
Defendants pursuant to Sections 10(b) and 20(a) of the
Securities Exchange Act of 1934 (the "Exchange Act").  (*See
generally* ECF No. 21, Am. Compl.)  Defendants move to dismiss
the Amended Complaint with prejudice pursuant to Rules 9(b) and

12(b)(6) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  For the reasons discussed below, Defendants' motion to dismiss is granted in its entirety.

<u>**BACKGROUND**</u>

The following facts, taken from Plaintiffs' Amended Complaint, documents incorporated by reference into the Amended Complaint, and documents within the purview of judicial notice, are assumed to be true for the purposes of Defendants' motions to dismiss.  *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (noting that courts may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the Securities Exchange Commission ("SEC"), and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit"); *see also Garber v. Legg Mason Inc.*, 347 Fed. App'x 665, 669 (2d Cir. 2009) (noting that courts may consider press coverage for the purpose of establishing whether corporate information was publicly available).

I.  <u>**The Parties**</u>

Plaintiffs each purchased Cablevision common stock during a class period between February 16, 2011, and October 28, 2011, and allege to have thereby been damaged.  (*See id.* ¶¶ 1,

12-13.)

Cablevision, through its subsidiaries, operates as a telecommunications, media, and entertainment company that provides telecommunications services, high-speed internet, and voice over internet protocol services, including iO TV digital television, Optimum Voice digital voice, Optimum Online high-speed internet, and Optimum WiFi wireless internet.  (Am. Compl. ¶ 14.)  According to Cablevision's SEC Form 10-Q for the quarter ending March 31, 2011, Cablevision's video television services accounted for 47% of the company's consolidated revenues during that time period.  (*Id.* ¶ 43.)

Dolan was, at all relevant times, Chief Executive Officer and President of Cablevision.  (*Id.* ¶ 15.)  Seibert has been Chief Financial Officer and Executive Vice President of Cablevision since June 2011.  (*Id.* ¶ 16.)  Huseby was Chief Financial Officer and Executive Vice President of Cablevision until his resignation in June 2011.  (*Id.* ¶ 17.)  Rutledge was, at all relevant times, Chief Operating Officer of Cablevision, in which capacity he oversaw the day-to-day operations of Cablevision under the supervision of Dolan.  (*Id.* ¶ 18.)  During the class period, the Individual Defendants were privy to confidential and proprietary information concerning Cablevision's operations, finances, financial condition, and present and future business prospects, including customer

subscription information that is the subject of the instant
suit.  (*See id.* ¶ 20.)

## II.  **Procedural History**

On January 26, 2012, individual plaintiff Gary
Livingston filed an initial putative class action complaint
against Defendants.  (ECF No. 1, Compl.)  On April 30, 2012, the
court appointed Plaintiffs as lead plaintiffs of the instant
class action.  (ECF No. 17, Order.)  At the same time, the law
firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller") was
appointed lead counsel for the putative class.  (*Id.*)  On June
29, 2012, Plaintiffs filed the Amended Complaint, which was
filed pursuant to Federal Rule of Civil Procedure 23(a) and
(b)(3) as a class action on behalf of all persons or entities
who purchased Cablevision common stock during the class period.
(Am. Compl. ¶ 25.)

On October 11, 2012, the court held a telephone pre-
motion conference regarding Defendants' prospective motion to
dismiss, during which the court offered Plaintiffs the
opportunity to file a second amended complaint addressing
Defendants' anticipated motion.  (Minute Entry dated Oct. 11,
2012.)  Plaintiffs declined to file a second amended complaint,
and Defendants' fully briefed motion to dismiss was filed on
February 1, 2013.  On August 13, 2013, the court heard oral
argument on Defendants' motion to dismiss and reserved decision.

III. **The Amended Complaint**

    A. **Factual Allegations**

        Plaintiffs' allegations are based upon investigation of, *inter alia*, SEC filings, other regulatory filings and reports, publicly available annual reports, press releases, published interviews, news articles and other media reports, and reports of securities analysts and investor advisory services from during the class period. (*Id.* ¶ 31.) Plaintiffs' allegations are also premised upon the first-hand knowledge of six confidential witnesses ("CWs") who were formerly employed by Cablevision. (*Id.* ¶ 32.) These CWs include a former Director of Database Marketing, two Account Managers, a Director of Customer Retention, a Telemarketing Retention Manager, and an Inbound Sales Manager, each of whom was employed by Cablevision during the class period. (*Id.* ¶¶ 33-38.)

        Prior to enactment of the Telecommunications Act of 1996, telephone and cable television companies were prohibited from competing against one another. (*Id.* ¶ 44.) Following passage of the telecommunications act, national telecommunications companies, such as Verizon Communications, Inc. ("Verizon"), were permitted to offer video television services and directly compete with regional television cable operators nationwide.

        Prior to 2006, however, Cablevision continued to enjoy

a virtual monopoly of telecommunications services in the greater New York City metropolitan area, at which time Verizon began to compete directly with Cablevision. (*See id.* ¶¶ 45-49.) By March of 2011, Verizon's FiOS internet, telephone, and video television service was available to approximately 40% of the households that Cablevision serviced. (*Id.* ¶ 51.)

On October 15, 2010, Cablevision's contract with News Corporation ("News Corp.") to retransmit FOX programming expired (the "retrans dispute"). (*Id.* ¶ 58.) The two companies were unable to agree upon a new contract; therefore, on October 16, 2010, News Corp. blocked Cablevision's video subscribers from viewing all FOX content. (*Id.*) The companies reached an agreement two weeks later on October 20, 2010, but not before Cablevision customers missed access to several Major League Baseball World Series and National Football League games. (*See id.* ¶¶ 59, 96.)

Between the fourth quarter of 2010 and the third quarter of 2011, Cablevision lost several thousand video subscribers per quarter, including the largest loss of 35,000 subscribers in the fourth quarter of 2010. (*See id.* ¶ 64.) Cablevision tracked and monitored its video subscriber losses on a weekly basis. (*See id.* ¶¶ 75-83.) Cablevision also specifically tracked the number of its subscribers who left Cablevision for Verizon, the company's primary competitor. (*Id.*

6

¶ 78.)   In an effort to mitigate its loss of video subscribers during the class period, Cablevision began extending expiring promotions and offering new promotions to former and existing subscribers.  (*See id.* ¶¶ 84-92.)

On February 16, 2011, the beginning of the class period, Cablevision publicly disclosed its annual SEC Form 10-K financial report for 2010.  (*Id.* ¶ 93.)  During a conference call with analysts and investors later that same day, Rutledge said the following:

> Basic subscribers declined by 1%, almost all of which is attributable to our decision to contest a retransmission consent demand. . . . In the fourth quarter [of 2010], we think that almost all of the either decreased sales or [increased] disconnects . . . result from the retrans fight.  And as we look at our data after that, the activity of the business is tracking like it was prior to that issue. . . .  I think it is an anomaly directly related to that. . . . [a]nd so I do think in that sense, it is kind of a one-time event.

(*Id.* ¶ 94.)  Thereafter, during a March 1, 2011, industry conference, Rutledge stated:

> Well, yes, I do think [Cablevision's video subscription losses in the fourth quarter of 2010] was an anomaly . . . .  [The retrans dispute] was a difficult thing to take on in that not only did we irritate customers by doing it and having some people disconnect, but we also had to spend a lot of marketing dollars and energy talking about things other than sales.  So we didn't take as many sales either during that period.

(*Id.* ¶ 97.)

Later on, during a May 5, 2011, conference call with analysts and investors to discuss Cablevision's first quarter 2011 SEC Form 10-Q financial report, Rutledge stated:

> Cablevision['s] core system, the traditional cable system, lost about 8400 video customers. Some of that was attributable, I think, to how we came into the year after the dispute we had with News Corp. and the carriage in the World Series.
>
> But we still continue to see softness in the economy, particularly in lower-income neighborhoods. . . . And that continues to be the biggest impact on us on a year-to-year basis.

(*Id.* ¶ 102.)

Three months later, on August 9, 2011, Cablevision filed its second quarter 10-Q report. (*Id.* ¶ 105.) At a conference call with analysts and investors later that same day, Rutledge agreed that Cablevision had "lost several points of video penetration" to Verizon's FiOS video service, but added that "it is a competitive marketplace where we can continue to provide superior products, superior customer service, and compete aggressively, and continue to grow our [revenue] by adding new value products into our sales mix and using our selling techniques to drive our customers toward those products." (*Id.* ¶ 106.) Rutledge also noted that Verizon had "been aggressive in their offer strategy in the second-quarter

and in the first-quarter, and that has been true throughout our footprint." (*Id.*)  Following the filing of Cablevision's second quarter 10-Q report and Rutledge's comments, the price of Cablevision stock fell $2.50 per share, or 13%, to close at $17.02 per share.  (*Id.* ¶ 108.)

On October 28, 2011, the last day of the class period, Cablevision filed its third quarter 10-Q report.  (*Id.* ¶ 109.) A press release by Dolan that same day discussed Cablevision's effective decrease of 4.9% in adjusted operating cash flow ("AOCF")[1] during the third quarter.  (*See id.* ¶ 109.)  According to Dolan's press release, the decrease in AOCF "was driven by cost increases, including both higher programming and sales and marketing costs."  (*Id.* ¶ 109.)  On a subsequent conference call with analysts and investors, Rutledge confirmed that Cablevision's video subscribers declined by 19,000, and that the company experienced "increases in sales and telemarketing costs and increases in . . . overall product marketing costs" during the third quarter.  (*Id.* ¶¶ 110, 112.)  Shortly thereafter, the price of Cablevision's stock fell $2.17 per share, or 13%, to close at $15.14.  (*Id.* ¶ 115.)

Plaintiffs allege that August 9, 2011, and October 28, 2011, were the first times that Cablevision disclosed its

---

[1] Cablevision more specifically defines AOCF as "operating income (loss) excluding depreciation and amortization (including impairments), share-based compensation expense or benefit and restructuring expense (or credit)."  (Am. Compl. ¶ 2 n.1.)

increased sales and marketing costs, and that the company's
"losses in video subscribers were not limited to the fourth
quarter of 2010--they were a continuing problem that Defendants
knew would plague the company throughout 2011," due to
competition from Verizon.  (*Id.* ¶ 2; *see id.* ¶ 113.)

Finally, during March 2011 of the class period, Huseby
sold 115,447 shares of his personally-held Cablevision common
stock for gross proceeds in excess of $4.1 million, which
Plaintiffs allege constitutes insider trading.  (*See id.* ¶ 122;
ECF No. 33, Decl. of Robert M. Rothman in Supp. of Pls.' Opp. to
Defs.' Mot. to Dismiss Ex. A (Plaintiffs' chart "depicting
insider trading" at Cablevision).)

B.  **Substantive Claims**

Plaintiffs' Amended Complaint contains the following
two claims:

**Claim I:** Defendants allegedly violated Section 10(b)
of the Exchange Act and Rule 10b-5 because they "disseminated or
approved false statements, which they knew or recklessly
disregarded [sic] were misleading in that they contained
misrepresentations and failed to disclose material facts
necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading" in
connection with Defendants' sale of Cablevision common stock to
Plaintiffs during the class period.  (*Id.* ¶¶ 128-32.)

10

Plaintiffs specifically allege that Rutledge's statements on February 16, March 1, and March 5, 2011, constitute false statements because: (1) "almost all of [Cablevision's] basic subscriber losses were . . . caused by increased competition" from Verizon; (2) "[Cablevision's] promotions for video subscribers were expiring in 2011, causing these . . . subscribers to be more likely to leave [Cablevision] for a competitor; and (3) "in order to stem video subscriber losses, Cablevision had to incur marketing and sales expenses, including by aggressively offering promotions, which would negatively impact [future] AOCF." (*See id.* ¶¶ 94-104.)  Plaintiffs allege that Defendants' conduct caused Cablevision's stock price to drop from $19.52 per share on August 8, 2011, to $15.14 per share on October 28, 2011, thereby causing economic harm to Plaintiffs. (*Id.* ¶¶ 119-20.)

**Claim II:** The Individual Defendants allegedly violated Section 20(a) of the Exchange Act based on control person liability for public statements made about Cablevision during the class period. (*Id.* ¶¶ 133-34.)

## DISCUSSION

### I.   Rule 12(b)(6) Standard

Rule 12(b)(6) provides for the dismissal of a cause of action if a plaintiff's complaint fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In

order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To determine whether a complaint states a plausible claim for relief, the Supreme Court has suggested a "'two-pronged approach.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). First, a court should begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  The plausibility standard, however, does not require a showing of a "probability"

12

of misconduct, but it does demand more than a "sheer possibility that a defendant has acted unlawfully." *Id*.

A well-pleaded complaint may survive a motion to dismiss even where "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citation and internal quotation marks omitted). This is because the court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

In conducting such an assessment on a Rule 12(b)(6) motion to dismiss, courts must "'accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party.'" *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008) (citation omitted); *see also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010). Further, courts may consider "the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit." *Holmes v. Air Line Pilots Ass'n*, 745 F. Supp. 2d 176, 193 (E.D.N.Y. 2010) (internal quotation marks omitted).

13

II.  **Defendants' Motion to Dismiss**

    A.   **Section 10(b) Claim**

        To state a claim for securities fraud under Section 10(b) of the Exchange Act, Plaintiffs must allege "(1) a material misrepresentation or omission by [Defendants]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Hutchins v. NBTY, Inc.*, No. 10-CV-2159, 2012 U.S. Dist. LEXIS 45678, at *9-10 (E.D.N.Y. Mar. 30, 2012) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011)). "'The PSLRA expanded on the Rule 9(b) standard, requiring that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *City of Taylor Gen. Emples. Ret. Sys. v. Magna Int'l, Inc.*, No. 12 Civ. 3553, 2013 U.S. Dist. LEXIS 120175, at *10 (S.D.N.Y. Aug. 22, 2013) (quoting *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012)).

        Defendants argue that Plaintiffs have failed to adequately allege either a material misrepresentation or omission, or scienter by Cablevision and the Individual

14

Defendants during the class period.  (*See* ECF No. 30, Defs.'
Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl. ("Defs.'
Mem.") at 15-27.)  Plaintiffs counter that they have
sufficiently alleged material misrepresentations and scienter by
Defendants.  (*See* ECF No. 32, Mem. of Law in Opp. to Mot. to
Dismiss ("Pls.' Opp.") at 7-26.)

### 1.  Material Misrepresentations

To sufficiently allege material misrepresentations or
misstatements as part of a Section 10(b) claim, Plaintiffs must
satisfy the heightened pleading standards of both Rule 9(b) and
the PSLRA and "(1) specify the statements that the plaintiff
contends were fraudulent, (2) identify the speaker, (3) state
where and when the statements were made, and (4) explain why the
statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164,
170 (2d Cir. 2004); *see also* 15 U.S.C. § 78u-4(b)(1)-(2)
(delineating requirements for PSLRA fraud actions).  "[The]
materiality requirement is satisfied when there is a substantial
likelihood that the disclosure of the omitted fact would have
been viewed by the reasonable investor as having significantly
altered the 'total mix' of information made available."
*Matrixx*, 131 S. Ct. at 1318 (internal quotation marks and
citation omitted).

Here, contrary to Plaintiffs' characterization of
Defendants' public disclosures, Cablevision and its executives

repeatedly made it abundantly and unequivocally clear via SEC disclosures before and during the class period that the company faced considerable competition from the rise of Verizon's video service, and that this competition had and would continue to cause Cablevision to lose video subscribers to Verizon and other competitors.  Indeed, as early as September 21, 2006, shortly after Verizon was permitted to enter the digital video market, Cablevision warned investors in its 2005 Annual Report, Form 10-K/A, that Verizon was "constructing systems designed to provide video programming as well as voice and data services to residential customers in parts of our service area" which "could present a significant competitive challenge to the Company." (ECF No. 31, Decl. of Robert J. Giuffra, Jr. Ex. 16, at 8.) Next, beginning on January 1, 2007, and continuing with each of Cablevision's quarterly and annual SEC reports through and including the end of the class period, the company warned investors that "[w]e face intense competition from incumbent telephone companies such as Verizon . . . which [has] recently begun to offer video programming in addition to their voice and high-speed Internet access services, evidencing their commitment to compete across all of the Company's telecommunications products" and that "Verizon has constructed fiber to the home network plant that passes a significant number of households in our service area." (*Id.* Ex. 20, at 13; *see generally id.* Exs.

1-11, 18, 21-28 (quarterly and annual SEC reports from January 1, 2007, through October 28, 2011).)

By May 7, 2009, the increased availability of Verizon's FiOS service within Cablevision's service area prompted Cablevision to disclose that "[c]ompetition from incumbent telephone companies has contributed to slower revenue growth rates in 2009 and this competition may continue to negatively impact our video revenue and video revenue growth rates in the future." (*Id.* Ex. 1, at 37.) Cablevision continued to include this disclosure in its SEC reports through the end of the class period on October 28, 2011. (*See generally id.* Exs. 2-11.) For instance, in Cablevision's Form 10-Q report for the quarterly period ending March 31, 2011, the company disclosed with regard to a loss of 8,900 video subscribers during that quarter that, "[w]e believe this is largely attributable to the economic downturn, and, to a lesser extent, intense competition, particularly from Verizon." (*Id.* Ex. 9, at 44.)

Prior to and throughout the class period, Cablevision also routinely disclosed its increased marketing and promotional expenses, which, as a result, had a negative impact on the company's AOCF. For example, Cablevision's Form 10-Q report for the third quarter of 2010 disclosed an "[i]ncrease in sales and marketing costs primarily due to customer promotions" during the

17

quarters immediately preceding the class period. (*Id.* Ex. 7, at 56.)  Cablevision later disclosed in its 2010 annual report that its increased revenues in the fourth quarter were "partially offset by promotional offer pricing discounts" and an "[i]ncrease in sales and marketing costs." (*Id.* Ex. 8, at 68, 71.)  Additionally, during the industry conference on March 1, 2011, Rutledge stated that Cablevision "had to spend a lot of marketing dollars" in the wake of the retrans dispute.[2] (Am. Compl. ¶ 97.)

Thus, during the class period, the competitive risk Verizon posed to Cablevision's position in the video programming market, as well as the increased promotional and marketing expenditures by Cablevision to stanch video subscriber losses in

---

[2] Plaintiffs argue that "once [Defendants] started speaking about their promotional expenses, then they were under an absolute obligation to tell the whole story to investors and that story included the fact that they were changing their pricing structure." (Transcript of Oral Argument held on Aug. 13, 2013 ("Tr."), at 37; *see also* Pls.' Opp. at 14-16.)  Any reasonable investor, however, would have understood that regardless of whether Cablevision's additional expenses were couched as "extended promotions" or "changes in pricing structure," the end result would have a negative impact on the company's AOCF.  Additionally, the Amended Complaint alleges that Defendants disclosed Cablevision's increased promotional expenses during the class period. (Am. Compl. ¶¶ 91, 104.)  Because Plaintiffs have failed to allege that "secret information render[ed Cablevision's] prior public statements materially misleading," Defendants had no duty to further disclose sensitive details about its marketing plans. *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 810 (2d Cir. 1996).

the face of that competition, had been made manifestly clear to Cablevision shareholders.[3]

Indeed, Plaintiffs concede that they "do not allege . . . that Cablevision and the Individual Defendants failed to adequately disclose that Verizon was a competitor." (Pls.' Opp. at 11.) Rather, Plaintiffs assert that Defendants' lone actionable misstatement was Rutledge having "falsely blamed the video subscriber loss on the Retrans dispute instead of competition with Verizon." (Id.; see also Tr. at 26 ("The false statement [was] when [Rutledge] said almost all of the losses [during the fourth quarter of 2010] were attributable to the retransmission dispute.").)  The sole issue with regard to Plaintiffs' Section 10(b) claim, therefore, is whether Rutledge's public comments about Cablevision's future performance and the impact of the retrans dispute on Cablevision's video subscriber losses between the fourth quarter

---

[3] In their memorandum of law, Defendants cite to five January and February 2011 research analyst reports which discuss and underscore Cablevision's increasing competition from Verizon. (Defs.' Mem. at 10-11.) District courts in the Second Circuit "may take judicial notice of the publication of such articles without transforming the [motion to dismiss] into a motion for summary judgment." In re UBS Ag Secs. Litig., No. 07 Civ. 11225, 2012 U.S. Dist. LEXIS 141449, at *106 n.28 (S.D.N.Y. Sept. 28, 2012); see also In re Merrill Lynch Tyco Research Sec. Litig., No. 03 CV 4080, 2004 U.S. Dist. LEXIS 2247, at *11 n.3 (S.D.N.Y. Feb. 18, 2004) ("The Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment."). Therefore, the court has considered the analyst reports cited by Defendants not for the truth of their content, but as corroboration of Defendants' statement that "the market had been saturated with warnings from Cablevision about its 'intense competition' with Verizon." (Defs.' Mem. at 10.)

of 2010 and the end of the class period were fraudulent.  The
court finds that they were not.

      First, irrespective of the substance of Rutledge's
comments following the release of Cablevision's quarterly SEC
reports, his statements must be considered in conjunction with
the substance of the company's unchallenged disclosures about
increased expenditures and heightened competition from Verizon
and other video providers.  *See Olkey v. Hyperion 1999 Term
Trust*, 98 F.3d 2, 9 (2d Cir. 1996) ("Since the plaintiffs'
claims are contradicted by the disclosure of risk made on the
face of each prospectus, no set of additional facts could prove
the plaintiffs' claims.  Representations made by the defendants
at the roadshows are immaterial since they are contradicted by
plain and prominently displayed language in the prospectuses.").
Rutledge's four isolated statements about the reasons for
Cablevision's increased video subscriber losses, most of which
were made immediately following the release of comprehensive SEC
reports by the company, cannot in and of themselves form the
basis of a securities fraud action.  *Cf. Dodds v. Cigna Sec.,
Inc.*, 12 F.3d 346, 351 (2d Cir. 1993) ("Nor can a plaintiff rely
on misleading oral statements to establish an unsuitability
claim when the offering materials contradict the oral
assurances."); *Good Hill Partners L.P. v. WM Asset Holdings
Corp. CI 2007-WM2*, 583 F. Supp. 2d 517, 520 (S.D.N.Y. 2008).

Second, Plaintiffs misconstrue the nature and intent of Rutledge's comments, which were clearly statements of opinion or mere puffery.  A statement of opinion is actionable as securities fraud "only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011); *see also Kowal v. IBM (In re IBM Corporate Sec. Litig.)*, 163 F.3d 102, 109 (2d Cir. 1998) ("[A]n opinion may still be actionable if the speaker does not genuinely and reasonably believe it or if it is without a basis in fact."). Plaintiffs neither adequately allege that Rutledge's comments were objectively false, nor that he did not believe them at the time they were made.

Again, there is no question that Cablevision regularly and explicitly disclosed to the public both the number and percentage of video subscribers that the company was steadily losing each quarter between the third quarter of 2010 and the third quarter of 2011, and that its video subscriber losses spiked at 35,000 during the fourth quarter of 2010 before dropping to 8,900 during the first quarter of 2011.  (*See* Defs.' Mem. at 7.)  On February 16 and May 5, 2011, Rutledge merely opined on the cause of that fourth quarter 2010 spike on behalf of Cablevision: "*we think* that almost all of the either decreased sales or [increased] disconnects . . . result from the

21

retrans fight. . . . And so *I do think* in that sense, it is kind of a one-time event," (Am. Compl. ¶ 94 (emphasis altered)); "*I do think* [the fourth quarter subscriber loss number] was an anomaly . . . [the retrans dispute] was a difficult thing to take on in that . . . we irritate[d] customers by doing it and having some people disconnect," (*id.* ¶ 97 (emphasis altered)). Rutledge likewise offered a mere opinion about the cause of the spike on May 5, 2011, when he stated that it "was attributable, *I think*, to how we came into the year after the dispute we had with News Corp. and the carriage in the World Series." (*Id.* ¶ 102 (emphasis altered).)

Plaintiffs correctly note that using the words "think" or "belief" "does not change the assertive nature of" certain statements. *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999); *see also id.* ("It is disingenuous to suggest that factual assertions are puffery and opinion that no reasonable investor could reasonably rely on for their truth simply because [a company] claims only to have stated that it believes in their truth."). Despite Plaintiffs' argument that "given their close monitoring of the video subscription losses, Defendants either knew of, or recklessly turned a blind eye to, numerous signs indicating that Cablevision customers were leaving the Company for Verizon," the Amended Complaint fails to allege that Defendants in fact knew

of, or recklessly turned a blind eye to, the *reason* Cablevision customers were leaving for Verizon, which was the subject of Rutledge's statements of opinion.[4]  (Pls.' Opp. at 23.)

Plaintiffs' bald assertion that Rutledge's statements were "based on past or current verifiable facts . . . . regarding why Cablevision was losing video subscribers--a matter that can be empirically determined" has no basis in the facts alleged in the Amended Complaint.  (*Id.* at 16); *see Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[Plaintiffs] must specifically identify the reports or statements containing [contrary] information.").  Indeed, Plaintiffs' counsel effectively conceded at oral argument that the CWs have not indicated that the Individual Defendants ever possessed, but failed to disclose, empirical proof of why--as between the retrans dispute, competition from Verizon, and economic conditions--Cablevision suffered a spike in subscriber losses in the fourth quarter of 2010.  (*See* Tr. at 31 ("I can ask the witnesses again and other witnesses what they were told by [subscribers] who left [Cablevision].")); *see also Clark v. Comcast Corp.*, 582 F. Supp. 2d 692, 705 (E.D. Pa. 2008)

---

[4]  In response to a question by the court at oral argument about Plaintiffs' basis for arguing that Cablevision in fact knew with certainty that its customers were leaving for Verizon in the fourth quarter of 2010 due to competition from Verizon, Plaintiffs' counsel offered only that "we certainly believe it's plausible that based on what was happening before the retransmission dispute and what was happening after the retransmission dispute, that people were leaving because of competition in both those periods."  (Tr. at 32.)

("[P]laintiffs do not identify specific documents that would contain facts or figures indicating that any of the 'undisclosed true facts' were true or known to the defendants, much less any other details about the content of those documents.").[5]

Nor does the Amended Complaint allege any plausible facts, from the CWs or any documents, to assert that Rutledge did not believe his opinion about the reasons for the fourth quarter spike in subscriber losses. Rather, viewed in the context of Cablevision's video subscriber losses prior to and following the fourth quarter of 2010, as detailed in the company's extensive SEC reports, it is clear that "no reasonable investor would rely on [Rutledge's statements about the retrans dispute] given [his] cautious language and qualifying terminology." *In re IBM*, 163 F.3d at 109. Simply stated, Rutledge's opinion as to why Cablevision lost a three-year high of 35,000 subscribers during the fourth quarter of 2010 is in no way inconsistent with the company's clear disclosures before and during the class period that Verizon posed a significant competitive challenge to Cablevision's ability to retain video subscribers, and that certain numbers of Cablevision's

---

[5] Plaintiffs attempt to distinguish *Clark*, an action filed by Plaintiffs' counsel, by arguing that, unlike the instant action, the plaintiffs in *Clark* relied "'exclusively on documentary evidence'" and made "'no mention of any confidential or other personal sources.'" (Pls.' Opp. at 24 n.15 (quoting *Clark*, 582 F. Supp. 2d at 704).) The Amended Complaint fails, however, to allege any facts indicating that the CWs can establish that the Individual Defendants knew with empirical certainty that Rutledge's statements were false at the time he made them.

subscribers were defecting to Verizon.  In fact, the quarterly change in Cablevision's net video subscribers after the fourth quarter of 2010 supports Rutledge's statement that "almost all of the either decreased sales or [increased] disconnects . . . result from the retrans fight . . . [, a]nd as we look at our data after that, the activity of the business is tracking like it was prior to that issue." (Am. Compl. ¶ 94; Defs.' Mem. at 7 (delineating subscriber losses of 8,900, 19,500, and 17,600 in the quarters following the quarter of the retrans dispute).)

Third, and finally, Rutledge's statement that Cablevision "can continue to provide superior products, superior customer service, and compete aggressively, and continue to grow" is quintessential inactionable puffery. *See Boca Raton Firefighters & Police Pension Fund v. Bahash,* 506 Fed. App'x 32, 37 (2d Cir. 2012) (finding statement by the defendant that "the integrity, reliability and credibility of [the defendant] has enabled us to compete successfully in an increasingly global and complex market, and that is true today and we are confident it will be so in the future" was inactionable puffery); *Lasker v. New York State Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir. 1996) (finding defendant's statement that its "business strategies will lead to continued prosperity" was "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable." (citing cases)).

25

In the absence of a concrete basis on which to allege that Rutledge's statements of opinion, about the retrans dispute having caused an "anomal[ous]" spike in video subscriber losses, were verifiably false or not in fact believed by Rutledge, Plaintiffs' Section 10(b) material misrepresentations claim must be and are dismissed.  *See San Leandro*, 75 F.3d at 812 ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."); *see also In re Sanofi-Aventis Secs. Litig.*, 774 F. Supp. 2d 549, 567 (S.D.N.Y. 2011) ("Plaintiffs cannot premise a fraud claim upon a mere disagreement with how [defendants] chose to interpret the results [of various clinical studies]."); *Clark*, 582 F. Supp. 2d at 705 ("[P]laintiffs' failure to identify the specific documents on which they rely is fatal to their ability to meet the pleading requirements set forth in the PSLRA.").

### 2.   Scienter

"A plaintiff alleging fraud in a § 10(b) action . . . must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference.  At trial, she must then prove her case by a 'preponderance of the evidence.' Stated otherwise, she must demonstrate that it is *more likely* than not that the defendant acted with scienter."  *Tellabs, Inc.*

*v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328–29 (2007)

(emphasis in original).  "An inference of fraudulent intent may

be plausible, yet less cogent than other, nonculpable

explanations for the defendant's conduct. . . . [A]n inference

of scienter must be more than merely plausible or reasonable--it

must be cogent and at least as compelling as any opposing

inference of nonfraudulent intent."  *Id.* at 314.

Plaintiffs may satisfy the "strong inference"

requirement by alleging facts "(1) showing that the defendants

had both motive and opportunity to commit the fraud or (2)

constituting strong circumstantial evidence of conscious

misbehavior or recklessness."  *ATSI Communs.,* 493 F.3d at 99.

Additionally, there is a "significant burden on the plaintiff in

stating a fraud claim based on recklessness."  *Chill v. GE*, 101

F.3d 263, 270 (2d Cir. 1996).

Because the court has already found that Plaintiffs

have failed to sufficiently allege material misrepresentations

on the part of Defendants, the court need not address the

sufficiency of Plaintiffs' allegations of scienter.

Nonetheless, the court notes that in their opposition papers,

Plaintiffs effectively abandon their insider trading allegations

against Huseby by conceding that they are "ancillary in nature."

(Pls.' Opp. at 25 n.16.)  Furthermore, although the Second

Circuit has not established a "*per se* rule that the sale by one

27

officer of corporate stock for a relatively small sum can never amount to unusual trading," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001), Plaintiffs have failed to allege that Huseby's stock sale was "dramatically out of line with prior trading practices," *In re Gildan Activewear, Inc.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009).  Additionally, as discussed above, Plaintiffs have failed to sufficiently allege that Defendants knew or recklessly disregarded the truth about a material misrepresentation.  Consequently, Defendants have failed to allege an inference of fraud that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."

**B.    Section 20(a) Claim**

"For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker."  *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011).  That is, "only those officers whose signatures appear on misleading statements may be liable as the 'makers' of those statements." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152,

165 (S.D.N.Y. 2012); *see also In re UBS Ag Secs. Litig.*, No. 07 Civ. 11225, 2012 U.S. Dist. LEXIS 141449, at *33 ("[I]ndividual defendants still must have actually 'made' the statements under the new *Janus* standard to be held liable under Section 10(b)."); *but see City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) ("[*Janus*] has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability.  It is not inconsistent with *Janus Capital* to presume that multiple people in a single corporation have the joint authority to 'make' an SEC filing, such that a misstatement has more than one 'maker.'").

Here, because Section 20(a) claims are "necessarily predicated on a primary violation of securities law," which Plaintiffs have failed to sufficiently allege, Plaintiffs' control person claims against the Individual Defendants must also be dismissed.  *Rombach*, 355 F.3d at 177-78.

## III. Plaintiffs' Request for Leave to Amend

"'[I]t is within the sound discretion of the district court to grant or deny leave to amend.'"  *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "[W]here amendment would be futile, denial of leave to amend is proper."  *Id.* at 140 (quotation marks omitted).

29

Here, Plaintiffs have previously declined the court's offer during the pre-motion conference on October 11, 2012, to allow them to file a second amended complaint.  (Minute Entry dated Oct. 11, 2012.)  Nonetheless, Plaintiffs now have requested leave to file a second amended complaint, but they have not "indicated to the . . . court how further amendment would permit [them] to cure the deficiencies in the complaint," nor have they "explained how they could cure the deficiencies that led to the dismissal of [their] complaint." *Wilson*, 671 F.3d at 139; (*see generally* Pls.' Opp. at 30-31 n.24).  "In the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *Bd. of Trs. of Ft. Lauderdale Gen. Emples. Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 883 (S.D.N.Y. 2011).  "No amount of detail can save [a] complaint when," as in this case, "the detail is based on flawed and unreasonable methodologies that lead to unsupported conclusions." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994). Plaintiffs' request for leave to file a second amended complaint is therefore denied.  *See Wilson* at 140 (affirming denial of leave to amend due to lack of "some indication as to what appellant[] might add to [his] complaint in order to make it viable" (alterations in original)); *see also Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 344 (S.D.N.Y. 2011)

(dismissing twice-amended complaint with prejudice on first
motion to dismiss); *Fort Worth Employers' Ret. Fund v. Biovail
Corp.*, 615 F. Supp. 2d 218, 233 (S.D.N.Y. 2009) (dismissing
once-amended complaint on first motion to dismiss "because the
flaws in pleading are incurable on the facts of this case").

## IV.  Rule 11 Inquiry

"The PSLRA mandates that, at the end of any private
securities action, the district court must 'include in the
record specific findings regarding compliance by each party and
each attorney representing any party with each requirement of
Rule 11(b).'"  *Rombach*, 355 F.3d at 178 (quoting 15 U.S.C. §
78u-4(c)(1)); *see also Simon DeBartolo Group, L.P. v. Richard E.
Jacobs Group, Inc.*, 186 F.3d 157, 167 (2d Cir. 1999) (noting
that the PSLRA "functions . . . to reduce courts' discretion in
choosing whether to conduct the Rule 11 inquiry at all").
Further, "if the court finds that any party or lawyer violated
Rule 11(b), the PSLRA mandates the imposition of sanctions."
*Rombach*, 355 F.3d at 178 (citing 15 U.S.C. § 78u-4(c)(2)).

Rule 11(b) pertains to parties' representations to the
court, and provides in relevant part:

> By presenting to the court a pleading,
> written motion, or other paper--whether by
> signing, filing, submitting, or later
> advocating it--an attorney or unrepresented
> party certifies that to the best of the
> person's knowledge, information, and belief,

formed after an inquiry reasonable under the
circumstances:
    (1)  it is not being presented for any
improper purpose, such as to harass, cause
unnecessary delay, or needlessly increase
the cost of litigation;
    (2)  the claims, defenses, and other
legal contentions are warranted by existing
law or by a nonfrivolous argument for
extending, modifying, or reversing existing
law or for establishing new law;
    (3)  the factual contentions have
evidentiary support or, if specifically so
identified, will likely have evidentiary
support after a reasonable opportunity for
further investigation or discovery; and
    (4)  the denials of factual contentions
are warranted on the evidence or, if
specifically so identified, are reasonably
based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

Here, as Judge Naomi Reice Buchwald of the Southern

District of New York recently found regarding a similar PSLRA

action also filed by Plaintiffs' counsel, "the amended complaint

fails to allege any material misstatements or omissions, does

not adequately allege scienter, and, indeed, borders on the

absurd." *City of Taylor*, No. 12 Civ. 3553, 2013 U.S. Dist.

LEXIS 120175, at *3.  Nevertheless, Defendants have not asserted

that Plaintiffs' submissions to the court have violated Rule

11(b).  Additionally, although the court herein dismisses

Plaintiffs' complaint in its entirety with prejudice, "[t]he

operative question is whether [Plaintiffs'] argument[s] [are]

frivolous, *i.e.*, the legal position[s] ha[ve] 'no chance of

success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.'" *Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) (quoting *Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995)).  The court finds that Plaintiffs' arguments, tenuous as they may be, are not frivolous, even though they lack factual support.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint with prejudice pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) is granted in its entirety.  The Clerk of the Court is respectfully directed to enter judgment in favor of Cablevision Systems Corporation, James L. Dolan, Gregg G. Seibert, Michael Huseby, and Thomas M. Rutledge, and close this case.

**SO ORDERED.**

Dated:      September 5, 2013
            Brooklyn, New York

                        _____/s/_____
                        Kiyo A. Matsumoto
                        United States District Judge
                        Eastern District of New York